# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOSE ALDERETE-LOPEZ,

       Petitioner,

vs.                                          No. CIV 18-1114 JB\SCY

JOHN WHITIKER, ACTING (TEMPORARY)
UNITED STATES ATTORNEY GENERAL;
KIRSTJEN NIELSEN, SECRETARY OF
THE DEPARTMENT OF HOMELAND SECURITY;
JESSE MENDEZ, FIELD OFFICE DIRECTOR,
FOR THE DISTRICT OF NEW MEXICO,

       Respondents.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Petition for Writ of Habeas Corpus and Release from Detention Pursuant to 28 U.S.C. § 2241, filed November 29, 2018 (Doc. 1)("Petition"). Petitioner Jose Alderete-Lopez, a Mexican national, currently is subject to electronic detention and is scheduled for removal from the United States of America on December 6, 2018. In the Petition, Alderete-Lopez requests the Court to: (i) "[i]ssue a Writ of Habeas Corpus requiring Respondents to release Petitioner"; (ii) "[i]ssue an injunction ordering Respondents to rescind the Final Administrative Removal Order"; (iii) expedite the "request" given Alderete-Lopez' "eminent removal"; and (iv) "[g]rant any other and further relief that this Court may deem fit and proper." Petition at 7. The Court will treat a portion of Alderete-Lopez' Petition as a request for a Temporary Restraining Order ("TRO"). The Court held a hearing on December 4, 2018. The primary issues are: (i) whether the Court has jurisdiction to consider the Petition and to grant the requested relief, and (ii) whether Alderete-Lopez is likely to succeed on the merits on his argument that, because the Notice to Appear, Form I-863 (dated June 8, 2011), filed November

29, 2018 (Doc. 1-1), lacked removal hearing date and time information, the immigration court did not have jurisdiction to issue a final removal order. The Court concludes that it lacks jurisdiction to review Alderete-Lopez' claim and to grant the requested relief. The Court further concludes that, if it had jurisdiction in this matter -- which it does not -- it would nevertheless deny the Petition's request for injunctive relief, because Alderete-Lopez has not demonstrated to the Court's satisfaction that he is likely to succeed on the merits of his challenge to his removal order's validity. Accordingly, the Court will dismiss the Petition without prejudice.

## FACTUAL BACKGROUND

The Court takes its facts from the Petition and the Memorandum of Law in Support of Petition for Writ of Habeas Corpus and Release from Detention Pursuant 28 U.S.C. § 2241, filed November 29, 2018 (Doc. 1-1)("Memo."). The Court does not set forth these facts as findings or the truth. The Court recognizes that the Petition and Memo. contain largely Alderete-Lopez' version of events and that, although the Respondents have made representations in this matter, see Respondents' Motion to Dismiss Petition for Writ of Habeas Corpus for Lack of Subject Matter Jurisdiction, filed December 3, 2016 (Doc. 6)("Response"), the Court has not relied on the Response for its facts, given the time restraints that Alderete-Lopez' forthcoming removal imposes.

Alderete-Lopez asserts that he is a native and citizen of Mexico and that he entered the United States "on a border crossing card[1] on or about June 8th, 1989." Petition at 3. On June 8,

_____

[1]According to the United States Department of State -- Bureau of Consular Affairs, a Border Crossing Card ("BCC") is "a B1/B2 visitor's visa. A BCC . . . is issued as a laminated card, which has enhanced graphics and technology, similar to the size of a credit card. It is valid for travel until the expiration date on the front of the card, usually ten years after issuance." Border Crossing Card, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/border-crossing-card.html (last visited Dec. 1, 2018). See 8 C.F.R. § 212.6 (detailing the BCC application process

2011, the United States Department of Homeland Security ("DHS") personally served Alderete-

Lopez with a Notice to Appear ("NTA").[2] Petition ¶ 12, at 3. See Form I-863 at 1 (dated June 8,

2011), filed November 29, 2018 (Doc. 1-1). The NTA states that Alderete-Lopez has "been

admitted to the United States," but is removable, pursuant to § 212(a)(7)(B)(i)(I) of the

Immigration and Nationality Act of 1952, 66 Stat. 182 ("INA"),[3] because, according to DHS,

Alderete-Lopez is "not a citizen of the United States"; is "a native of MEXICO and a citizen of

MEXICO"; and is "not in possession of a passport valid for a minimum of six months from the

date of [Alderete-Lopez'] admission to the United States." Form I-863 at 1. Further, the NTA

orders Alderete-Lopez

> to appear before an immigration judge of the United States Department of Justice
> at: Executive Office for Immigration Review[,] 8915 Montana Avenue[,] El Paso[,]
> TX 79925 on a date to be set at a time to be set to show why [Alderete-Lopez]

---

and its permissible uses); Roa-Rodriquez v. United States, 410 F.2d 1206, 1208 (10th Cir. 1969)(describing a BCC as authorizing Mexican nationals "to visit in the United States for a period of 72 hours or less and in the area within 150 miles of the Mexican border."). A B1/B2 visitor's visa is a combination business and tourism nonimmigrant visa for persons who want to enter the United States temporarily. See Visitor Visa, https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visitor.html (last visited Dec. 3, 2018).

[2]An NTA, otherwise known as a Form I-863, "is a document given to an alien that instructs them [sic] to appear before an immigration judge on a certain date. The issuance of an NTA commences removal proceedings against the alien." United States Customs and Immigration Services Updates Notice to Appear Policy Guidance to Support DHS Enforcement Priorities, https://www.uscis.gov/news/news-releases/uscis-updates-notice-appear-policy-guidance-support-dhs-enforcement-priorities (last visited Dec. 1, 2018).

[3]INA § 212(a)(7)(B)(i)(I) provides for removal of a noncitizen who

> is not in possession of a passport valid for a minimum of six months from the date
> of the expiration of the initial period of the alien's admission or contemplated initial
> period of stay authorizing the alien to return to the country from which the alien
> came or to proceed to and enter some other country during such period.

INA, 8 U.S.C. § 1182.

should not be removed from the United States based on the charge(s) set forth above.

Form I-863 at 1 (emphasis added).  The NTA includes a Certificate of Service, which indicates that DHS Border Patrol Agent Jaime Armendariz served the NTA on Alderete-Lopez, that Armendariz provided oral notice "of the time and place of his or her hearing and of the consequences of failure to appear" to Alderete-Lopez in Spanish, and that Alderete-Lopez "refused to sign" the certificate.  Form I-863 at 2.

In February 2017, an immigration judge ordered Alderete-Lopez' removal to Mexico. Petition ¶ 13, at 4.  Alderete-Lopez appealed to the Board of Immigration Appeals ("BIA"),[4] which sustained the Immigration judge's removal order.  See Petition ¶ 14, at 4.  In December, 2017, Alderete-Lopez filed a motion to reconsider "and was placed on electronic monitoring."  Petition

---

[4]The BIA is

the highest administrative body for interpreting and applying immigration laws.  It is authorized up to 21 Board Members, including the Chairman and Vice Chairman who share responsibility for BIA management.  The BIA is located at [Executive Office for Immigration Review] headquarters in Falls Church, Virginia.  Generally, the BIA does not conduct courtroom proceedings -- it decides appeals by conducting a "paper review" of cases.  On rare occasions, however, the BIA hears oral arguments of appealed cases, predominately at headquarters.

The BIA has been given nationwide jurisdiction to hear appeals from certain decisions rendered by immigration judges and by district directors of the [DHS] in a wide variety of proceedings in which the Government of the United States is one party and the other party is an alien, a citizen, or a business firm.

BIA decisions are binding on all DHS officers and immigration judges unless modified or overruled by the Attorney General or a federal court.  Most BIA decisions are subject to judicial review in the federal courts.  The majority of appeals reaching the BIA involve orders of removal and applications for relief from removal.

Board of Immigration Appeals, https://www.justice.gov/eoir/board-of-immigration-appeals (last visited Dec. 1, 2018).  See 8 C.F.R. 1003.1 (detailing BIA organization, jurisdiction, and powers).

¶ 15, at 4.  On September 11, 2018, the BIA denied Alderete-Lopez' Motion to Reconsider.  See Petition ¶ 14, at 4.  On November 9, 2018, DHS mailed to Rosa Lopez De Alderete a Notice of Obligor to Deliver Alien which demands that Lopez De Alderete deliver Jose Alderete-Lopez to the United States Immigration and Customs Enforcement Albuquerque Sub Office at 9:00 a.m. on December 6, 2018, for removal.  See Notice to Obligor to Deliver Alien at 1, filed November 29, 2018 (Doc. 1-1).

## PROCEDURAL BACKGROUND

On November 29, 2018, Alderete-Lopez' filed the Petition.  See Petition at 1.  In the Petition, Alderete-Lopez alleges two violations of the Fifth Amendment to the Constitution of the United States: (i) that the Final Administrative Removal Order violates "Fundamental Due Process," because the immigration judge lacked subject matter jurisdiction to issue the removal order, Petition ¶ 24, at 5, and (ii) that Alderete-Lopez' "continued detention" violates his right to "substantive due process," Petition ¶ 31, at 6.  Regarding the Final Administrative Removal Order, Alderete-Lopez argues that, because the NTA "lacked a date and time, it was invalid and failed to vest jurisdiction in the immigration court that ordered him removed."  Petition ¶ 24, at 5.  As authority for this assertion, Alderete-Lopez quotes from the Supreme Court of the United State's June 21, 2018, decision in Pereira v. Sessions, 138 S. Ct. 2105 (2018): "A putative notice to appear that fails to designate the specific time or place of the noncitizen's removal proceedings is not a

'notice to appear under section 1229(a),[5]' and so does not trigger the stop-time rule.[6]" Petition ¶ 23, at 5 (quoting Pereira v. Sessions, 138 S. Ct. at 2113-14). Alderete-Lopez further contends that his detention is predicated on the allegedly unlawful removal proceedings that the NTA initiated. See Petition ¶ 33, at 6.

In his Memo., Alderete-Lopez avers that jurisdiction vests with the immigration court only when DHS files a proper NTA, i.e., an NTA that includes a date and time to appear before the tribunal. See Memo. at 2 (citing 8 C.F.R. § 1003.14 (a)). Moreover, according to Alderete-Lopez, 8 U.S.C. § 1299(a) "makes clear" that an NTA must include "the time and place of the hearing." Memo. at 3 (citing 8 U.S.C. § 1299(a) ("In removal proceedings under section 1229(a) . . . written notice . . . shall be given in person to the alien . . . specifying . . . [t]he time and place at which the

---

[5]The Supreme Court's reference to "Section "1229(a)" signifies the notice provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546 ("IIRIRA"), which provides that "nonpermanent residents who are subject to removal proceedings may be eligible for cancellation of removal if, among other things, they have 'been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [an] application' for cancellation." Pereira v. Sessions, 138 S. Ct. at 2107 (quoting 8 U.S.C. § 1229(b)(1)(A)). "Section 1229(a), in turn, provides that the Government shall serve noncitizens in removal proceedings with a written " 'notice to appear,' " specifying, among other things, "[t]he time and place at which the [removal] proceedings will be held." Pereira v. Sessions, 138 S. Ct. at 2107 (quoting § 1229(a)(1)(G)(i)).

[6]Under the stop-time rule "the period of continuous presence is 'deemed to end . . . when the alien is served a notice to appear under section 1229(a).'" Pereira v. Sessions, 138 S. Ct. at 2107 (quoting 8 U.S.C. § 1229(d)(1)(A)). The Supreme Court notes that

per a 1997 regulation stating that a "notice to appear" served on a noncitizen need only provide "the time, place and date of the initial removal hearing, where practicable," 62 Fed. Reg. 10332, the [DHS] at least in recent years, almost always serves noncitizens with notices that fail to specify the time, place, or date of initial removal hearings whenever the agency deems it impracticable to include such information. The [BIA] has held that such notices trigger the stop-time rule even if they do not specify the time and date of the removal proceedings.

Pereira v. Sessions, 138 S. Ct. at 2107.

proceedings will be held."). Hence, according to Alderete-Lopez, <u>Pereira v. Sessions</u> stands for a

pronouncement broader than holding an NTA deficient only for cancellation-of-removal purposes:

> The statutory text plainly requires inclusion of the "time and place at which
> proceedings will be held," and, accordingly, an NTA without this information is
> not just defective -- it is, quite simply, not a sufficiently legal Notice to Appear.
> Because it omits the time and place of proceedings, the charging document in this
> case is, per *Pereira*, not a Notice to Appear.

Memo. at 3 (citing 8 U.S.C. § 1299(a)). Alderete-Lopez concludes that, in this case, "removal

proceedings were thus not commenced, and the Immigrations Court's jurisdiction did not vest,

upon [the NTA's] filing." Memo. at 3. Although Alderete-Lopez concedes that the specific issue

in <u>Pereira v. Sessions</u> was whether an NTA without time and-place information triggers

§ 1229(a)'s stop-time rule, the Supreme Court's use of the words "integral" and "essential" to

describe the NTA's time-and-place information demonstrate that, in reaching its holding, the

Supreme Court necessarily concluded that any NTA lacking such information, no matter the

context, is an invalid NTA. Memo. at 6.

Alderete-Lopez urges the Court to disregard the BIA's decision in <u>Matter of Bermudez-

Cota</u>, 27 I&N 441 (BIA 2018)("<u>Bermudez-Cota</u>"). <u>See</u> Petition ¶ 33, at 6. Alderete-Lopez asserts

that the BIA in <u>Bermudez-Cota</u> "held that a 'Putative' NTA may meet the statutory requirements

under Sec. 239(a) of the [INA] and vest the immigration court with jurisdiction provided that the

date, time, and place of the hearing is later sent to the alien' via a notice of hearing." Memo. at 7

(quoting <u>Bermudez-Cota</u>, 27 I&N at 447). According to Alderete-Lopez,

> *Pereira* expressly rejects the premise that a putative notice to appear can be cured
> by a subsequently issued notice of hearing; rather, a notice of appear lacking the
> hearing date and time is not merely an "incomplete" notice to appear -- it is not a
> notice to appear . . . at all.

Memo. at 7 (citing <u>Pereira v. Sessions</u>, 138 S. Ct. at 2113-14, 2116-17).  Moreover, Alderete-Lopez avers that an immigration court lacks statutory authority to issue NTAs, which, pursuant to 8 C.F.R. 239.1(a), only DHS can issue.  <u>See</u> Memo. at 7 (citing 8 C.F.R. 239.1(a)).

Alderete-Lopez adds that the BIA's decision to "hem in" <u>Pereira v. Sessions</u> to the stop-time rule and cancellation-of-removal context is "misplaced and in contravention of the plain meaning of the statute in question," because <u>Pereira v. Sessions</u> does not address the jurisdictional issue central to the case before the Court.  Memo. at 8.  According to Alderete-Lopez, the Supreme Court "passed the jurisdictional question in *Pereira sub silentio*," and thus it does not stand for the proposition that the immigration court in fact had jurisdiction in Pereira's case.  Memo. at 9 (citing <u>Lewis v. Casey</u>, 518 U.S. 343, 352 n.2 (1996)("The existence of unaddressed jurisdictional defects has no precedential effect.")).  As support for this assertion, Alderete-Lopez cites to an opinion authored by the Honorable David Briones, Senior United States District Judge for the Western District of Texas, wherein, according to Alderete-Lopez, Judge Briones rejected the BIA's decision in <u>Bermudez-Cota</u> and concluded that "[t]he immigration court lacked subject matter jurisdiction when it failed to comply with the statutory guidelines by proceeding with removal when the Notice to Appear, the charging document that vests jurisdiction in the court, lacked a date and time."  Memo. at 9 (quoting <u>United States v. Pedroza-Rocha</u>, EP-18-CR-1286-DB, 2018 U.S. Dist. LEXIS 178633, *14 (W.D. Tex. Sept. 21, 2018)(Briones, J.)).  Alderete-Lopez asserts that Judge Briones also concluded that the BIA overemphasized the phrase: "and so does not trigger the stop-time rule," because the phrase follows "the coordinating conjunction 'and,'" and therefore functions as "a separate point that does not limit the first independent clause [of] the sentence, '[a] putative notice to appear . . . is not a notice to appear under section 1229(a).'"  Memo.

at 9 (quoting <u>United States v. Pedroza-Rocha</u>, 2018 U.S. Dist. LEXIS 178633, at *11 (quoting

<u>Pereira v. Sessions</u>, 138 S. Ct. at 2113-114 (internal quotation marks omitted)).

On December 3, 2018, the Respondents filed the Response.  <u>See</u> Response at 1.  In the

Response, the Respondents contend that the Court should dismiss the Petition, because the Court,

according to the Respondents, lacks jurisdiction to review Alderete-Lopez' claims.  <u>See</u> Response

at 1.  The Respondents further assert that "[e]ven if the Court could reach the merits of Petitioner's

argument, *Pereira*'s narrow holding does not support the broad proposition advanced by

Petitioner."  Response at 4.

The Court held a hearing.  <u>See</u> Transcript of Hearing at 1:21-22 (taken December 4,

2018)("Dec. 4 Tr.").[7]  At the hearing, Alderete-Lopez represented that, although the NTA lacked

date and time information, he nevertheless participated in his removal proceedings, to which the

Court inquired: "But from a factual standpoint tell me what happened.  How did he end up being

in front of the immigration court and vigorously contesting it.  How did that happen?"  Dec. 4

Tr at 11:1-4 (Court).  Alderete-Lopez responded that he "He got a notice of a hearing.  And then,

based on the notice of a hearing, he appeared.  And he did at that point start contesting the issues

of his deportability at that time."  Dec. 4 Tr at 11:1-4 (Juarez).  At Alderete-Lopez' request, the

Court stated that it would provide Alderete-Lopez with an order by 12:00 p.m. on December 5,

2018.  Dec. 4 Tr at 43:15-17 (Juarez, Court).

## LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION

Under the Administrative Procedure Act ("APA"),

[a] person suffering legal wrong because of agency action, or adversely affected or
aggrieved by agency action within the meaning of a relevant statute, is entitled to
judicial review thereof.  An action in a court of the United States seeking relief

---

[7]The Court's citations to the hearing transcript refer to the court reporter's original, unedited
version.  Any final transcript may contain slightly different page and/or line numbers.

other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702 (emphasis in original). The APA states that district courts can:

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be --

> (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B)     contrary to constitutional right, power, privilege, or immunity;
>
> (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D)     without observance of procedure required by law;
>
> (E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

Under Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed *as appeals*. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." 42 F.3d 1560, 1580 (10th Cir. 1994)(emphasis in original). See WildEarth Guardians v. U.S. Forest Serv., 668 F.

Supp. 2d 1314, 1323 (D.N.M. 2009)(Browning, J.). "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant." N. New Mexicans Protecting Land & Water Rights v. United States, No. CIV 15-0559, 2015 WL 8329509, at *9 (D.N.M. 2015 Dec. 4, 2015)(Browning, J.).

1. **Reviewing Agency Factual Determinations.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E). The APA's two linguistic formulations amount to a single substantive standard of review. Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984)(Scalia, J.)(explaining that, as to factual findings, "there is no *substantive* difference between what [the arbitrary or capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)). See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of Fed. Reserve Sys., 745 F.2d at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness. The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies." (emphasis in original)). See also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv., 140 F. Supp. 3d at 1167-68 (discussing this fact).

In reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record. See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party . . . ."); Fed. R. App. P. 16(a) ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted . . . ."). See also Franklin Sav. Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here Congress has provided for judicial review without setting forth . . . procedures to be followed in conducting that review, the Supreme Court has advised such review shall be confined to the administrative record and, in most instances, no de novo proceedings may be had." (footnote omitted)). Tenth Circuit precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews agency action. See New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.21 (10th Cir. 2009)("We take judicial notice of this document, which is included in the record before us in [another case]." (citing Fed. R. Evid. 201(b))); New Mexico ex. rel. Richardson v. Bureau of Land Mgmt., 565 F.3d at 702 n.22 ("We conclude that the occurrence of Falcon releases is not subject to reasonable factual dispute and is capable of determination using sources whose accuracy cannot reasonably be questioned, and we take judicial notice thereof."). In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits have held that taking judicial notice is inappropriate in APA reviews absent extraordinary circumstances or inadvertent omission from the administrative record. See

Compassion Over Killing v. U.S. Food & Drug Admin., 849 F.3d 849, 852 n.1 (9th Cir. 2017);

Nat'l Mining Ass'n v. Sec'y U.S. Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016).

To fulfill its function under the APA, a reviewing court should engage in a "thorough, probing, in-depth review" of the record before it when determining whether an agency's decision survives arbitrary-or-capricious review. Wyoming v. United States, 279 F.3d 1214, 1238 (10th Cir. 2002)(citation and internal quotation marks omitted). The Tenth Circuit explains:

> "[I]n determining whether the agency acted in an 'arbitrary and capricious manner,' we must ensure that the agency 'decision was based on a consideration of the relevant factors' and examine 'whether there has been a clear error of judgment.'" We consider an agency decision arbitrary and capricious if "the agency . . . relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999)(quoting Friends of the Bow v. Thompson, 124 F.3d 1210, 1215 (10th Cir. 1997)). Arbitrary-or-capricious review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse v. Commodity Credit Corp., 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172. The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See SEC v. Chenery Corp., 318 U.S. 80, 92-95 (1943). While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(citation omitted).

## 2. **Reviewing Agency Legal Interpretations**.

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States, and Courts reviewing those interpretations apply three different deference standards, depending on the kind of law at issue. First, the federal judiciary accords considerable deference to an agency's interpretation of a statute that Congress has tasked it with enforcing. See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994). This is known as Chevron deference, named after the supposedly seminal case, Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").[8] Chevron deference is a two-step process[9] that first asks whether the statutory provision in question is clear and, if it is not, then

_____

[8]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all. Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years. See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

[9]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all. See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006). Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000). An affirmative answer to all three inquiries results in the agency's decision passing step zero.

asks whether the agency's interpretation of the unclear statute is reasonable. As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative agency interpretations of their organic statutes laid down by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . . (1984). Those directives require that we first determine whether Congress has directly spoken to the precise question at issue. If the congressional intent is clear, we must give effect to that intent. If the statute is silent or ambiguous on that specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at 238 (citing Chevron, 467 U.S. at 842-43).

Chevron's second step is all but toothless, because if the agency's decision makes it to step two, it is upheld almost without exception. See Ronald M. Levin, The Anatomy of Chevron: Step Two Reconsidered, 72 Chi.-Kent L. Rev. 1253, 1261 (1997)("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second *Chevron* step."); Jason J. Czarnezki, An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law, 79 U. Colo. L. Rev. 767, 775 (2008)("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice."). Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

Chevron's first step, in contrast, has bite, but there is substantial disagreement about what it means. In an earlier case, the Court noted the varying approaches that different Supreme Court Justices have taken in applying Chevron deference:

> The Court notices a parallel between the doctrine of constitutional avoidance and the Chevron doctrine. Those Justices, such as Justice Scalia, who are most loyal to the doctrines and the most likely to apply them, are also the most likely to keep the "steps" of the doctrines separate: first, determining whether the statute is ambiguous; and, only then, assessing the merits of various permissible

> interpretations from the first step.  These Justices are also the most likely to find
> that the statute is unambiguous, thus obviating the need to apply the second step of
> each doctrine.  Those Justices more likely to find ambiguity in statutes are more
> likely to eschew applying the doctrines in the first place, out of their distaste for
> their second steps -- showing heavy deference to agencies for <u>Chevron</u> doctrine,
> and upholding facially overbroad statutes, for constitutional avoidance.

<u>Griffin v. Bryant</u>, 30 F. Supp. 3d 1139, 1192 n.23 (D.N.M. 2014)(Browning, J.).  A number of

policy considerations animate <u>Chevron</u> deference, among them: (i) statutory interpretation, <u>i.e.</u>,

that Congress, by passing extremely open-ended and vague organic statutes, grants discretionary

power to the agencies to fill in the statutory gaps; (ii) institutional competency, <u>i.e.</u>, that agencies

are more competent than the courts at filling out the substantive law in their field; (iii) political

accountability, <u>i.e.</u>, that agencies, as executive bodies ultimately headed by the President of the

United States of America, can be held politically accountable for their interpretations; and

(iv) efficiency, <u>i.e.</u>, that numerous, subject-matter specialized agencies can more efficiently

promulgate the massive amount of interpretation required to maintain the modern regulatory state -

- found in the Code of Federal Regulations and other places -- than a unified but Circuit-

fragmented federal judiciary can.

Second, when agencies interpret their own regulations -- to, for example, adjudicate

whether a regulated party was in compliance with them -- courts accord agencies what is known

as <u>Auer</u> or <u>Seminole Rock</u> deference.  <u>See</u> <u>Auer v. Robbins</u>, 519 U.S. 452 (1997)("<u>Auer</u>"); <u>Bowles</u>

<u>v. Seminole Rock & Sand Co.</u>, 325 U.S. 410 (1945)("<u>Seminole Rock</u>").  This deference is applied

in the same manner as <u>Chevron</u> deference and is substantively identical.  There would be little

reason to have a separate name for this doctrine, except that its logical underpinnings are much

shakier, and its future is, accordingly, more uncertain.  Justice Scalia, after years of applying the

doctrine followed by years of questioning its soundness, finally denounced <u>Auer</u> deference in 2013

in his dissent in <u>Decker v. Northwest Environmental Defense Center</u>, 568 U.S. 597 (2013).  The

Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the

Justice himself:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations." This is generally called *Seminole Rock* or *Auer* deference.

> . . . .

> The canonical formulation of *Auer* deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation." But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation. Obviously, that is not enough, or there would be nothing for *Auer* to do. In practice, *Auer* deference is *Chevron* deference applied to regulations rather than statutes. The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

> Our cases have not put forward a persuasive justification for *Auer* deference. The first case to apply it, *Seminole Rock,* offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Our later cases provide two principal explanations, neither of which has much to be said for it. First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it. The implied premise of this argument -- that what we are looking for is the agency's *intent* in adopting the rule -- is false. There is true of regulations what is true of statutes. As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means." Whether governing rules are made by the national legislature or an administrative agency, we are bound *by what they say*, not by the unexpressed intention of those who made them.

> The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of *rulemaking*, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of

agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation *will be given effect* if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for *Auer* deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that *Congress* enacted, as we do per *Chevron*, it is *a fortiori* reasonable to defer to them regarding the meaning of *regulations that they themselves crafted*. To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of *Chevron* (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Congress cannot enlarge its *own* power through *Chevron* - - whatever it leaves vague in the statute will be worked out *by someone else*. *Chevron* represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.) So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect. "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power." Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it." And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation. *Auer* deference encourages agencies to be "vague in framing

regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  *Auer* is not a logical corollary to *Chevron* but a dangerous permission slip for the arrogation of power.

It is true enough that *Auer* deference has the same beneficial pragmatic effect as *Chevron* deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court.  The agency's view can be relied upon, unless it is, so to speak, beyond the pale.  But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute.  For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.  The circumstances of this case demonstrate the point. While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of *Chevron*-type deference has less severe pragmatic consequences for rules than for statutes.  In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from *Auer* deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 568 U.S. at 616-21 (Scalia, J., dissenting)(alterations and emphasis in original)(citations omitted).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.

Last, courts afford agencies no deference in interpreting the Constitution.  See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference. . . . [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions."

(citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))). Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content. The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation. See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

### 3. Waiving Sovereign Immunity.

The APA waives sovereign immunity with respect to non-monetary claims. See 5 U.S.C. § 702. The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . .

5 U.S.C. § 702. Claims for money damages seek monetary relief "to *substitute* for a suffered loss." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d 1290, 1298 (10th Cir. 2009)(emphasis in original). Claims that do not seek monetary relief or that seek "specific remedies that have the effect of compelling monetary relief" are not claims for monetary damages. Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1298. To determine whether a claim seeks monetary relief, a court must "look beyond the face of the complaint" and assess the plaintiff's prime objective or essential purpose; "[a] plaintiff's prime objective or

essential purpose is monetary unless the non-monetary relief sought has significant prospective effect or considerable value apart from the claim for monetary relief." Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (internal quotation marks omitted)(quoting Burkins v. United States, 112 F.3d 444, 449 (10th Cir. 1997)).

The APA's sovereign immunity waiver for claims "seeking relief other than money damages" does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act, 28 U.S.C. §§ 1346, 1491, permits district courts to hear some claims against the United States, but it also states that "district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). It follows that the APA does not waive the United States' sovereign immunity as to contract claims even when those claims seek relief other than money damages, such as declaratory or injunctive relief. See Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1295. Consequently, two questions determine whether the APA waives the United States' sovereign immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,' such that the APA's general waiver of sovereign immunity is even implicated? Second, does the Tucker Act expressly or impliedly forbid the relief that [the plaintiff] seeks, such that the APA's waiver does not apply?" Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING INITIATION OF REMOVAL PROCEEDINGS

Title 8 U.S.C. § 1229(a) directs immigration judges to conduct proceedings for deciding the inadmissibility or deportability of an alien in the United States. See 8 U.S.C. § 1229a(a)(1)-(3) (directing that "immigration judge[s] shall conduct proceedings for deciding the inadmissibility

or deportability of an alien," and stating that, unless otherwise specified, "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States"). The requirements for jurisdiction in the immigration court are set forth in regulations promulgated by the Attorney General pursuant to authority delegated to him by statute. See 8 U.S.C. § 1103(g)(2) (providing that the Attorney General "shall establish such regulations . . . as the Attorney General determines to be necessary for carrying out this section"). Under the promulgated regulations, jurisdiction[10] vests and proceedings commence before an immigration court when a "charging

---

[10]There appears to be confusion about whether "jurisdiction" in 8 C.F.R. § 1003.14 refers to personal jurisdiction, subject-matter jurisdiction, or both. See Marco v. United States, No. 1:09-cv-761, 2010 WL 3992113, at *8 (S.D. Ohio Oct. 12, 2010)(Dlott, J.)(concluding that "jurisdiction" in 8 C.F.R. § 1003.14(a) "denotes subject-matter jurisdiction"); Shogunle v. Holder, 336 F. App'x 322, 323 (4th Cir. 2009)(concluding that "jurisdiction" had not vested with the immigration court under 8 C.F.R. §1003.14, notwithstanding that that the alien had appeared at the hearing); United States v. Lira-Ramirez, No. 18-10102-JWB, 2018 WL 5013523, at *6 n.4 (D. Kan. Oct. 15, 2018)(Broomes, J.)(explaining why "jurisdiction" in 8 C.F.R. § 1003.14 also contains parallels to the standard requirements for personal jurisdiction, including the service of process). As a general rule, appearance and failure to object can waive personal jurisdiction, see Am. Ass'n of Naturopathic Physicians v. Hayhurst, 227 F.3d 1104, 1106 (9th Cir. 2000), whereas subject-matter jurisdiction cannot be waived at any time during the underlying proceedings, see Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702-03 (1982).

The INA authorizes the Attorney General "in his discretion and under such regulations as he may prescribe" to adjust a noncitizen's status to that of legal permanent resident. 8 U.S.C. § 1255(a). Removal proceedings before an immigration judge are to be the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3). "Jurisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court." See 8 C.F.R. § 1003.14(a). At that point, the "immigration judge hearing the [removal] proceeding has exclusive jurisdiction to adjudicate any application for adjustment of status the alien may file." 8 C.F.R. § 1245.2(a)(1)(i). Moreover, a separate regulation provides that "USCIS has jurisdiction to adjudicate an application for adjustment of status filed by any alien, unless the immigration judge has jurisdiction to adjudicate the application under 8 CFR 1245.2(a)(1)." 8 C.F.R. § 245.2. Cf. Puc-Ruiz v. Holder, 629 F.3d 771, 782 (8th Cir. 2010)("When the [immigration judge] lacks jurisdiction, [the judge's] decisions are nullities.")

document" is filed with the immigration court.  8 C.F.R. § 1003.14(a).  The phrase "charging document" refers to a "written instrument which initiates a proceeding before an Immigration Judge . . . includ[ing] a Notice to Appear."  8 C.F.R. § 1003.13.

Title 8 U.S.C. § 1229(a)(1) sets out the "Notice to Appear" requirements for proceedings held pursuant to § 1229(a), and, in relevant part, states:

> In removal proceedings under section 1229a of this title, written notice (in this section referred to as a "notice to appear") shall be given in person to the alien (or, if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) specifying the following:
>
> (A) The nature of the proceedings against the alien.
>
> (B) The legal authority under which the proceedings are conducted.
>
> (C) The acts or conduct alleged to be in violation of law.
>
> (D) The charges against the alien and the statutory provisions alleged to have been violated.
>
> (E) The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel under subsection (b)(1) of this section and (ii) a current list of counsel prepared under subsection (b)(2) of this section.

---

Taken together, the statutory and regulatory scheme seeks to regulate which tribunal has adjudicatory authority over applications to adjust status in different circumstances.  Hence, 8 C.F.R. § 1003.14 and 8 C.F.R. § 1245.2 regulate the immigration court's, and other tribunals' -- like the federal courts' -- subject-matter jurisdiction.  Consistent with this holding, several federal district courts have dismissed cases pending before them on the grounds that the immigration court has exclusive subject-matter jurisdiction to adjudicate applications to adjust status pursuant to 8 C.F.R. § 1245.2.  See Zhao v. Chertoff, No. 07-cv-4576, 2009 WL 700709, at *2 (E.D. N.Y. Mar. 15, 2009)(Irizarry, J.); Lu v. Chertoff, No. CV 08-3576, 2008 WL 4559747, at *2 (C.D. Cal. Oct. 7, 2008)(Gutierrez, J.); Ishaq v. Dept. of Homeland Security, No. Civ. A. H-06-1903, 2006 WL 2524090, at *2 (S.D. Tex. Aug. 31, 2006)(Rosenthal, J.).  When the federal courts and the immigration court are sorting out what court has the statutory and regulatory authority and power to hear a case, that issue goes to the court's subject-matter jurisdiction, and the parties cannot waive defects in connection to subject-matter jurisdiction.  In other words, if the underlying court has exclusive jurisdiction, others courts cannot exercise that jurisdiction.  If follows that, when a noncitizen appears for his or hearing before the immigration court, and thereby has an opportunity to contest the allegation's merits, the immigration court has jurisdiction over the noncitizen. See 8 C.F.R. § 1003.18.

(F)(i) The requirement that the alien must immediately provide (or have provided) the Attorney General with a written record of an address and telephone number (if any) at which the alien may be contacted respecting proceedings under section 1229a of this title.

(ii) The requirement that the alien must provide the Attorney General immediately with a written record of any change of the alien's address or telephone number.

(iii) The consequences under section 1229a(b)(5) of this title of failure to provide address and telephone information pursuant to this subparagraph.

(G)(i) <u>The time and place at which the proceedings will be held</u>.

(ii) The consequences under section 1229a(b)(5) of this title of the failure, except under exceptional circumstances, to appear at such proceedings.

8 U.S.C. § 1229(a)(1) (emphasis added). A noncitizen's failure to appear for the scheduled removal hearing will result in the immigration judge entering an in absentia order of removal against the noncitizen. <u>See</u> 8 U.S.C. § 1229a(b)(5).

Because removal proceedings in the immigration court fall under § 1229(a)'s purview, the statute's plain language requires that NTAs issued for those proceedings contain the time and place of the removal hearing, although regulations permit subsequent notification of such information. <u>See</u> 8 U.S.C. § 1229(a)(1)(G)(i); 8 C.F.R. § 1003.18(b). In <u>Pereira v. Sessions</u>, the Supreme Court examined § 1229a and its NTA requirements in the context of the stop-time rule. <u>See</u> 138 S. Ct. at 2113-114. The Supreme Court held that an NTA that does not include the date, time, and/or place of the scheduled immigration court hearing does not trigger the stop-time rule for cancellation of removal purposes. <u>See</u> 138 S. Ct. at 2113-14. Pereira, the petitioner in the case, had entered the United States in 2000 and remained after his visa expired. <u>See</u> 138 S. Ct. at 2112. In 2006, after an arrest for operating a vehicle while under the influence of alcohol, DHS served Pereira with an NTA that did not include the date, time, and place of Pereira's removal hearing. <u>See</u> 138 S. Ct. at 2112. The NTA stated that the hearing's time and place were "to be set." 138 S.

Ct. at 2112.  Subsequently, Pereira moved, and although he submitted the required change of

address documents, the immigration court mailed a hearing notice advising him of the time and

place to appear to the wrong address.  See 138 S. Ct. at 2112.  As a result, an immigration judge

ordered Pereira's removal in absentia in 2007, although Pereira did not learn of this order until

2013.  See 138 S. Ct. at 2112.  Because of the lack of notice, however, the immigration court

subsequently rescinded the in absentia order and reopened proceedings.  See 138 S. Ct. at 2112.

On the merits, the immigration court denied Pereira's application for cancellation of removal,

finding that the 2006 NTA stopped the accrual of continuous physical presence in the United

States.  See 138 S. Ct. at 2112.  Relying on Matter of Camarillo, 25 I&N Dec. 644 (BIA 2011),[11]

the BIA upheld the immigration court's decision, as did the United States Court of Appeals for the

First Circuit, which applied Chevron deference[12] to the BIA's interpretation of the stop-time rule.

See 138 S. Ct. at 2112-13.

---

[11]In Matter of Camarillo, the BIA concluded that NTAs trigger the stop-time rule even if
they do not specify the time and date of the removal proceedings.  See Matter of Camarillo, 25
I&N at 651.  The BIA reasoned that the statutory phrase "notice to appear 'under section
[1229](a)'" in the stop-time rule "merely specifies the document the DHS must serve on the alien
to trigger the 'stop-time' rule," but otherwise imposes no "substantive requirements" as to what
information that document must include to trigger rule.  Matter of Camarillo, 25 I&N at 651.

[12]Chevron deference, as discussed above, describes the framework by which the federal
judiciary accords considerable deference to an agency's interpretation of a statute that Congress
has tasked it with enforcing.  See United States v. Undetermined Quantities of Bottles of an Article
of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994).  Chevron deference is a two-step process
that first asks whether the statutory provision in question is clear and, if it is not, then asks whether
the agency's interpretation of the unclear statute is reasonable; as the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in
> Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 . . .
> (1984).  Those directives require that we first determine whether Congress has
> directly spoken to the precise question at issue.  If the congressional intent is clear,
> we must give effect to that intent.  If the statute is silent or ambiguous on that

In an 8-1 decision, that the Honorable Sonia M. Sotomayor, Associate Justice of the Supreme Court of the United States authored, the Supreme Court found that "[a] notice that does not inform a noncitizen when and where to appear for removal proceedings is not a 'notice to appear under section 1229(a)' and therefore does not trigger the stop-time rule." Pereira v. Sessions, 138 S. Ct. at 2110 (quoting § 1229(a)).  The Supreme Court adds that "[t]he plain text, the statutory context, and common sense all lead inescapably and unambiguously to that conclusion."  138 S. Ct. at 2110.

The Supreme Court's statutory analysis rested on its findings that: (i) § 1229(a)(1) defines NTAs to include written notice of the date and place of the removal hearing as set forth in § 1229(a)(1)(G)(i); (ii) § 1229(a)(2), which authorizes a change or postponement of proceedings to a new "time or place," presumes that DHS already served an NTA containing a time and place; (iii) § 1229(b)(1), which affords noncitizens at least ten days after service of an NTA to secure counsel before the first court appearance unless waived, must be read to require a specific time and place on the NTA to have meaning; and (iv) common sense dictates that the words "notice to appear" require notice of the information individuals need to appear for removal hearings.  Pereira v. Sessions, 138 S. Ct. at 2114-16.  Such analysis compelled the Supreme Court to reject the BIA's contrary conclusion, that six courts of appeal had affirmed, which had found the language of the stop-time rule ambiguous and had deferred to the agency's position that NTAs without a specific

---

specific issue, we must determine whether the agency's answer is based on a permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at 238 (citing Chevron, 467 U.S. at 842-43).

time and place could trigger the stop-time rule.[13]  See 138 S. Ct. at 2113-14 (referencing decisions

from the Second, Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits).  Moreover, the Supreme

Court rejected the United States' argument that drafting NTAs specifying a time and place of

removal proceedings would be administratively challenging, noting "[g]iven today's advanced

software capabilities, it is hard to imagine why DHS and immigration courts could not . . . work

together to schedule hearings before sending notices to appear."  138 S. Ct. at 2118-19.  Thus, the

Supreme Court concluded that NTAs that do not contain at least this basic information do not meet

the definition of an NTA under 8 U.S.C. § 1229(a)(1) for purposes of the stop-time rule.  See 138

S. Ct. at 2113-14 ("A notice that does not inform a noncitizen when and where to appear for

removal proceedings is not a notice to appear under section 1229(a).").

Subsequent to Pereria v. Sessions, several federal district courts have concluded that an

NTA that fails to include the removal hearings' time or place is deficient under § 1229(a).  See,

United States v. Virgen-Ponce, 320 F. Supp. 3d 1164 (E.D. Wash. 2018)( Nielsen, J.); United

States v. Lopez-Urgel, No. 1:18-CR-310-RP, 2018 WL 5984845 (W.D. Tex. Nov. 14,

2018)(Pitman, J.); United States v. Alfredo-Valladares, No. 1:17-CR-156-SS, 2018 U.S. Dist.

LEXIS 199044 (W.D. Tex. Oct. 30, 2018)(Sparks, J.); United States v. Pedroza-Rocha, No. EP-

18-CR-1286-DB, 2018 U.S. Dist. LEXIS 178633 (W.D. Tex. Sept. 21, 2018)(Briones, J.); United

States v. Cruz-Jimenez, No. A-17-CR-00063, 2018 WL 5779491 (W.D. Tex. Nov. 2,

2018)(Sparks, J.).  Importantly, in the § 1326 context, even several district courts that have

ultimately denied dismissal of defendants' criminal indictments -- for failure to satisfy the statutory

---

[13]In his concurrence, the Honorable Anthony M. Kennedy, former Associate Justice of the
Supreme Court of the United States, expressed concern that lower courts, when applying Chevron,
were giving a "cursory analysis" to ascertaining congressional intent and "reflexive deference" to
the BIA's position.  Pereira v. Sessions, 138 S. Ct. at 2120 (Kennedy, J., concurring).

requirements to present a collateral challenge to a removal order pursuant to § 1326(d)[14] -- have agreed that <u>Pereria v. Sessions</u> requires that NTAs issued for removal proceedings contain the date and time of a noncitizen's hearing. <u>See United States v. Santos Larios-Ajualat</u>, No. 18-10076-JWB, 2018 WL 5013522, at *4 (D. Kan. Oct. 15, 2018)(Broomes, J.)(stating that the "Defendant's notice to appear was clearly defective under *Pereira*, as it did not include a specific date and time to appear," but ultimately concluding that the indictment was not subject to dismissal); <u>United States v. Lira-Ramirez</u>, No. 18-10102-JWB, 2018 WL 5013523, at *4 (D. Kan. Oct. 15, 2018)(Broomes, J.); <u>United States v. Mendoza-Sanchez</u>, No. 17-cr-189-JD, 2018 WL 5816346, at *2 (D.N.H. Nov. 5, 2018)(DiClerico, J.)(noting that the NTA served on the alien "was deficient under *Pereira* because it did not contain the time and date of the removal hearing," but ultimately denying that alien's collateral attack on the removal order in the subsequent § 1326 proceeding); <u>United States v. Zapata-Cortinas</u>, No. SA-18-CR-00343-OLG, 2018 U.S. Dist. LEXIS 199042, *8-10 (W.D. Tex. Nov. 20, 2018)(Garcia, J.)("Defendant received a deficient NTA, and thus, it appears the immigration judge issued a removal order that was outside of her authority and for which there was no formal, vested jurisdiction.").[15]

---

[14]In <u>United States v. Adame-Orozco</u>, 607 F.3d 647 (10th Cir. 2010), the Tenth Circuit establishes that, to collaterally attack a deportation order pursuant to 8 U.S.C. § 1326(d), the defendant must show, "(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." <u>United States v. Adame-Orozco</u>, 607 F.3d at 651.

[15]Neither the Tenth Circuit nor any of the other Courts of Appeals have decided whether <u>Pereira v. Sessions</u>' holding extends beyond the stop-time rule. Hence, in the absence of controlling authority, several federal district courts have found instructive the BIA's position in <u>Bermudez-Cota</u>, and thereby rejected noncitizens' jurisdictional challenges to removal proceedings. <u>See United States v. Cortez</u>, No. 6:18-CR-22, 2018 WL 6004689, at *3 (W.D. Va. Nov. 15, 2018)(Moon, J.); <u>United States v. Saravia-Chavez</u>, No. 3:18-CR-00016, 2018 WL 5974302, at *3-4 (W.D. Va. Nov. 14, 2018)(Moon, J.); <u>United States v. Ramos-Delcid</u>, No. 3:18-

-28-

CR-00020, 2018 WL 5833081, at \*3-5 (W.D. Va. Nov. 7, 2018)(Moon, J.); <u>United States v. Romero-Colindres</u>, No. 1:18-CR-00415, 2018 WL 5084877, at \*2 (N.D. Ohio Oct. 18, 2018)(Polster, J.); <u>United States v. Fernandez</u>, No. 7:18-CR-11-BO-1, 2018 WL 4976804, at \*1 (E.D.N.C. Oct. 15, 2018)(Boyle, C.J.); <u>United States v. Munoz-Alvarado</u>, No. CR-18-171-C, 2018 WL 4762134, at \*1 (W.D. Okla. Oct. 2, 2018)(Cauthron, J.); <u>United States v. Ibarra-Rodriguez</u>, No. CR-18-190-M, 2018 U.S. Dist. LEXIS 164127, 2018 WL 4608503, at \*2-3 (W.D. Okla. Sept. 25, 2018)(Miles-LaGrange, J.); <u>United States v. Hernandez-Ruiz</u>, No. 17-cr-226-ELR, Dkt. No. 49, 2018 U.S. Dist. LEXIS 195354, at \*2 (N.D. Ga. Sept. 21, 2018)(Ross, J.); <u>United States v. Veloz-Alonzo</u>, No. 1:18-CR-202-CAB, 2018 U.S. Dist. LEXIS 195353, at\*2-3 (N.D. Ohio Sept. 18, 2018)(Boyko, J.); <u>United States v. Ornelas-Dominguez</u>, No. 5:18-cr-110-CJC, 2018 U.S. Dist. LEXIS 195582, at \*10-11 (C.D. Cal. Aug. 10, 2018)(Carney, J.); <u>Ramat v. Nielsen</u>, 317 F. Supp. 3d 1111, 1117 (S.D. Cal. 2018)(Benites, J.); <u>United States v. Romero-Caceres</u>, No. 1:18-cr-354, 2018 U.S. Dist. LEXIS 197439, at \*22 (E.D. Va. Nov. 19, 2018)(Ellis, J.).

The BIA in <u>Bermudez-Cota</u> concluded that <u>Pereira v. Sessions</u> is limited to the meaning of the stop-time rule, and that an NTA which fails to specify the time or place of a hearing is thus not legally defective for purposes of vesting the immigration court with jurisdiction. <u>See</u> 27 I&N at 443-44. The BIA in <u>Bermudez-Cota</u> therefore held, consistent with several pre-<u>Pereira v. Sessions</u> Courts of Appeals decisions, that the immigration court is vested with jurisdiction when DHS files a notice to appear that complies with the regulations, and that a notice of hearing specifying the date and time of the removal hearing may subsequently be sent to the noncitizen. <u>See</u> 27 I&N at 445-47 (citing <u>Popa v. Holder</u>, 571 F.3d 890 (9th Cir. 2009); <u>Gomez-Palacios v. Holder</u>, 560 F.3d 354, 359 (5th Cir. 2009); <u>Dababneh v. Gonzales</u>, 471 F.3d 806, 809-10 (7th Cir. 2006); <u>Haider v. Gonzales</u>, 438 F.3d 902, 907 (8th Cir. 2006)). The district courts that limit <u>Pereira v. Sessions</u> to the stop-time rule in accordance with <u>Bermudez-Cota</u> have concluded that the BIA's decision in that case is entitled to <u>Chevron</u> deference. <u>See United States v. Romero-Caceres</u>, 2018 U.S. Dist. LEXIS 197439, \*21 (E.D. Va. Nov. 19, 2018). In <u>United States v. Romero-Caceres</u>, for example, the Honorable T.S. Ellis, United States District Judge for the Eastern District of Virginia, concluded that this deference is because the Supreme Court has held that "the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." <u>United States v. Romero-Caceres</u>, 2018 U.S. Dist. LEXIS 197439 at \*21 (internal quotation marks omitted)(quoting <u>I.N.S. v. Aguirre-Aguirre</u>, 526 U.S. 415, 425 (1999). Moreover, continues Judge Ellis,

> it is well-settled that when the BIA construes the [INA], a reviewing court asks first "whether the statute is silent or ambiguous with respect to the specific issue before it"; if so, the second "question for the court [is] whether the agency's answer is based on a permissible construction of the statute,"

<u>United States v. Romero-Caceres</u>, 2018 U.S. Dist. LEXIS 197439 at \*21 (quoting <u>I.N.S. v. Aguirre-Aguirre</u>, 526 U.S. at 424 (internal quotation marks omitted)(quoting <u>Chevron</u>, 467 U.S. at 843)), and "[a]n agency's construction of the statute is permissible unless it is 'arbitrary, capricious, or manifestly contrary to the statute,'" <u>United States v. Romero-Caceres</u>, 2018 U.S. Dist. LEXIS 197439, at \*21 (quoting <u>Chevron</u>, 467 U.S. at 844)).

## LAW REGARDING REQUESTS FOR A TRO

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order.  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1181 (D.N.M. 2011)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration.  See Fed. R. Civ. P. 65(b).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Leviton Mfg. Co., Inc. v. Nicor, Inc., Nos. CIV 04-0424 JB/RHS, 04-1295 JB/ACT, 2007 WL 505796, at *3 (D.N.M. Jan. 8, 2007)(Browning, J.)(citing Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("In issuing a preliminary

---

The Court is unpersuaded by the BIA's opinion Bermudez-Cota.  As a threshold matter, the BIA's opinion relies on a line of caselaw that is no longer applicable, at least with respect to the validity of a deficient NTA as a charging document, following Pereira v. Sessions.  See 27 I&N at 447 (citing several pre-Pereira v. Sessions Courts of Appeals decisions).  Further, the Supreme Court made clear that this is not an issue on which the BIA is entitled to deference; the Supreme Court explained that Congress "supplied a clear and unambiguous answer" as to the requirements for NTAs under § 1229(a), and thus, "the Court need not resort to Chevron deference."  Pereira v. Sessions 138 S. Ct. at 2114 (citing Chevron, 467 U.S. at 842-43 ("[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  Moreover, in his concurrence, Justice Kennedy expressed concern that lower courts where giving "reflexive deference" to the BIA's position.  Pereira v. Sessions, 138 S. Ct. at 2120 (Kennedy, J., concurring).  Given Congress' clear language and the Supreme Court's explicit analysis of this issue, the Court finds the statute's unambiguous language is more persuasive than the BIA's continued insistence that 1229(a) does not require NTAs to contain time and place information to initiate § 1229(a) proceedings.

injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to preliminary relief under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order. Fed. R. Civ. P. 65(b). A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

In other words, in determining whether to grant injunctive relief, a court considers the following four factors:

> (i) whether the moving party will suffer irreparable injury unless the injunction issues; (ii) whether there is a substantial likelihood that the moving party will eventually prevail on the merits; (iii) whether the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (iv) whether the injunction, if issued, would not be adverse to the public interest.

Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181 (citing Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992); Fed. Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir.

2016)("Diné").  In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in *Winter v. Natural Resources Defense Council*," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22).  The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "*Winter's* rationale seems to apply with equal force" to the likelihood-of-success factor.  Diné, 839 F.3d at 1282.  Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné, 839 F.3d at 1282.

The Court has written several times on the topic of TROs and preliminary injunctions.  In O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M. 2017)("O Centro"), the Court issued a preliminary injunction requiring the United States Citizen and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist religious organization ("UDV").  See O Centro, 286 F. Supp. 3d at 1269.  The Court issued that relief, in part because it was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro, 286 F. Supp. 3d at 1263-64.  USCIS had denied the petition, because the minister made no money and because the minister was not part of an established missionary program.  See 286 F. Supp. 3d at 1264.  UDV theology precluded its ministers from making money, and an established missionary program requires that at least one religious worker, at some point, be

compensated.  See 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had substantially burdened the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money.  See 286 F. Supp. 3d at 1264.  The minister also met a preliminary injunction's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.  The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Public Schools, 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies" including "cupping and shaking girls' breasts" were unreasonably and unconstitutionally intrusive, even if those type of searches were likely effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighed the damage of the TRO; and (iv) the TRO was not adverse to the public, because it would protect other students' constitutional rights who attended prom and graduation.  Herrera v. Santa Fe Public Schools, 792 F. Supp. 2d at 1182-99.

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

> The Due Process Clause encompasses two distinct forms of protection:
> (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.

Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. at 845-46). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mut. Ins. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72 (footnote omitted). "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries," because "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572. Concerning the

Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> "Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men." In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572 (citation omitted)(quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923)).

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572, 576.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, and college professors and staff members dismissed during the terms of their contracts, have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576–77 (citations omitted).

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is 'created by independent sources such as a state or federal statute,

a municipal charter or ordinance, or an implied or express contract.'" <u>Teigen v. Renfrow</u>, 511 F.3d 1072, 1079 (10th Cir. 2007)(quoting <u>Carnes v. Parker</u>, 922 F.2d 1506, 1509 (10th Cir. 1991)). <u>See</u> <u>Paul v. Davis</u>, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

<u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577. <u>See</u> <u>Farthing v. City of Shawnee</u>, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577)).

 "[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'" <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 541 (1985)(quoting <u>Morrissey v. Brewer</u>, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. at 542 (quoting <u>Mullane v. Cent. Hanover Bank & Tr. Co.</u>, 339 U.S. 306, 313 (1950)). "(D)ue process is flexible and calls for such procedural protections as the particular situation demands." <u>Mathews v. Eldridge</u>, 424 U.S. at 334 (internal quotation marks omitted)(alteration in original)(quoting <u>Morrisey v. Brewer</u>, 408 U.S. at 481). The Supreme Court has explained that

> "the root requirement" of the Due Process Clause [is] "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 . . . (1971)(emphasis in

original) . . . . This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents v. Roth*, 408 U.S. at 569-570 . . . .

> . . . .

> . . . [T]he pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut*, 401 U.S. at 378 . . . . In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action. *Matthews v. Eldridge*, 424 U.S. at 343 . . . .

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote and citations omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "the private interest that will be affected by the official action" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." *Hamdi v. Rumsfeld*, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335 . . .). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" *Id.* (quoting Mathews v. Eldridge, 424 U.S. at 335 . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999). See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires a predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies

postponing the hearing until after the event" (internal quotation marks omitted)(quoting <u>Smith v. Org. of Foster Families for Equal. and Reform</u>, 431 U.S. 816, 848 (1977))).

The Court has previously considered procedural due process violations several times. For example, in <u>A.M. through Youngers v. New Mexico Department of Health</u>, No. CIV 13-0692, 2015 WL 13668431 (D.N.M. Dec. 7, 2015)(Browning, J.), the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement. <u>See</u> 2015 WL 13668431, at *37-43. The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing. <u>See Salazar v. City of Albuquerque</u>, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win."). <u>See also Duprey v. Twelfth Judicial Dist. Court</u>, 760 F. Supp. 2d 1180, 1215 (D.N.M. 2009)(Browning, J.)(denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); <u>Camuglia v. City of Albuquerque</u>, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), <u>aff'd</u>, 448 F.3d at 1221 (the Tenth Circuit concluded that "it cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Due Process Clause of the Fourteenth Amendment of the United States of America provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983

only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts.  See Robbins v. Oklahoma, 519 F.3d 1242, 1251 (10th Cir. 2008)(citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1.    Exceptions to the General Rule.

There are, however, two exceptions to the general rule.  The first -- the special-relationship exception -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994).  The second -- the danger-creation exception -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).  "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'"  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)).  The Court's decision in Glover v. Gartman was also consistent with a previous Tenth Circuit decision -- Radecki v. Barela, 146 F.3d 1227 (10th Cir. 1998) -- in which the Tenth Circuit stated:

> It is true, of course, that "state actors are generally only liable under the Due Process Clause for their own acts and not private violence."  There are, however, two

exceptions to that rule.  First, the state may be subject to constitutional liability if it does not perform a duty to provide protection to an individual with whom the state has a special relationship because it has assumed control over that individual, such as in a prison.  Second, the state may be constitutionally liable if it creates a danger that results in harm to an individual, even if that harm is ultimately inflicted by a private party.  The "shocks the conscience" standard applies to both types of suits.

Radecki v. Barela, 146 F.3d at 1230 (citations omitted)(quoting Uhlrig v. Harder, 64 F.3d 567, 572-73(10th Cir. 1995)).

## 2.    The Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine. A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g., when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder, 64 F.3d at 572.

## 3.    The Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when a state actor "affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  See Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm."  Uhlrig v.

Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'"  Estate of B.I.C. v. Gillen, 710 F.3d at 1173 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima-facie case for a danger-creation claim for due-process violations, the plaintiff must show that his or her claim meets a six-part test:

> (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk.

Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE–2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act with an "intent to cause a particularized harm."  Medina v. City & Cty. of Denver, 960 F.2d 1493, 1496 (10th Cir. 1992), overruled on other grounds by Cty. of Sacramento v. Lewis, 523 U.S. 833 (1998).  The intent to place a person unreasonably at risk is present where the defendant is "aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496.

### 4.    What Shocks the Conscience.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)). "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (alteration in original)(internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 573). "Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1275 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of

penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience."  Martinez v. Uphoff, 265 F.3d at 1134 (internal quotation marks omitted)(quoting the district court's opinion).  The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, 'inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard.'" 265 F.3d at 1135 (alteration in original)(quoting the district court's opinion).

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiff alleged that the defendants -- the school district and its superintendent, and a middle school's principal and vice principal -- violated the plaintiff's substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[16] the plaintiff's son.  716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent AS from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

---

[16] The parties in Schaefer v. Las Cruces Public School District defined "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked.

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## ANALYSIS

The Court, after carefully considering the Petition, concludes that it lacks jurisdiction to review Alderete-Lopez' claim and to grant the requested relief. The Court further concludes that, even if it had jurisdiction in this matter, it would nevertheless deny the Petition's request for injunctive relief, because Alderete-Lopez has not demonstrated, to the Court's satisfaction, that he is likely to succeed on the merits of his challenge to his removal order's validity. Accordingly, the Court will dismiss the Petition.

## I. THE COURT WILL NOT GRANT ALDERETE-LOPEZ' REQUESTS IN THE PETITION, BECAUSE THE COURT LACKS SUBJECT-MATTER JURISDICTION OVER THE CHALLENGE TO THE UNDERLYING REMOVAL ORDER.

Alderete-Lopez' challenge to his removal order must fail before the Court, because the Court, as a federal district court, lacks subject-matter jurisdiction to adjudicate a challenge to an immigration court's removal order. "Federal courts are courts of limited jurisdiction," possessing only the power that the Constitution authorizes. Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994). Pursuant to rule 12 of the Federal Rules of Civil Procedure, "[i]f the court determines that it lacks subject matter jurisdiction, it must dismiss the claim." Fed. R. Civ. P. 12(h)(3).

Title 8 U.S.C. § 1252 governs judicial review of final orders of removal. See 8 U.S.C. § 1252 (describing the judicial review process). The REAL ID Act of 2005, 119 Stat. 302, which amends § 1252, curtails habeas review by shifting "certain immigration disputes formerly raised through habeas corpus in the district courts to the courts of appeals and converted them into petitions for review." Hem v. Maurer, 458 F.3d 1185, 1188 n.3 (10th Cir. 2006). Subsection 1252(a)(5), titled "Exclusive Means of Review," provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision . . . a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter . . . . For purposes of this chapter, every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review.

8 U.S.C. § 1252(a)(5) (emphasis added). A district court thus maintains the ability to review a habeas petition challenging detention, but lacks jurisdiction over a petition challenging a final order of removal. See Ferry v. Gonzales, 457 F.3d 1117, 1131 (10th Cir. 2006). When a habeas challenge to detention is grounded on the merits of the underlying removal order, a district court lacks jurisdiction to hear the claim. See Ferry v. Gonzales, 457 F.3d at 1131 (concluding that a district court lacked jurisdiction to decide a habeas petition premised on challenging an order of removal and converting that portion of a habeas petition into a petition for review before the Circuit Court of Appeals); Essuman v. Gonzales, 203 F. App'x 204, 211-12 (10th Cir. 2006)(stating that the district court in that case properly transferred a habeas petition to the Circuit Court of Appeals when petitioner's challenge to detention was "grounded in the removal order rather than based on some inherent problem with the detention itself").

Here, the Petition challenges the validity of Alderete-Lopez' removal order as a basis for contesting his detention. See Petition ¶ 24, at 5 ("Because Mr. Alderete's Notice to Appear lacked

a date and time, it was invalid and failed to vest jurisdiction in the immigration court that ordered him removed"). Whatever the claim's merits, the Court, as a federal district court, lacks jurisdiction to decide whether the removal order is valid. See Ferry v. Gonzales, 457 F.3d at 1131. Therefore, because the Petition is premised on Alderete-Lopez' removal order's alleged deficiencies, the Court must dismiss the Petition for lack of subject-matter jurisdiction.

## II. EVEN IF THE COURT HAD JURISDICTION, THE COURT WOULD NOT GRANT ALDERETE-LOPEZ' REQUESTS IN THE PETITION, BECAUSE THE COURT CONCLUDES THAT ALDERETE-LOPEZ IS UNLIKELY TO SUCCEED ON THE MERITS.

A preliminary injunction is an extraordinary remedy; accordingly, the right to relief must be clear and unequivocal. See Flood v. ClearOne Commc'ns, Inc., 618 F.3d 1110, 1117 (10th Cir. 2010). To meet this burden, a party seeking a preliminary injunction must show: (1) a likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and that (4) the injunction would not adversely affect the public interest. See Awad v. Ziriax, 670 F.3d 1111, 1125 (10th Cir. 2012). If the injunction will (1) alter the status quo, (2) mandate action by the defendant, or (3) afford the movant all the relief that it could recover after a full trial on the merits, the Tenth Circuit has held that the movant must meet a heightened burden. See O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft, 389 F.3d at 975. Under those circumstances, the proposed injunction "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course," and "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft, 389 F.3d at 975.

The Court concludes that Alderete-Lopez has not satisfied the likelihood-of-success element. Here, Alderete-Lopez seeks an injunction mandating relief, which would require

Respondents affirmative act to release Alderete-Lopez from electronic detention.  See O Centro

Espirita Beneficiente Uniao do Vegetal v. Ashcroft, 389 F.3d at 975.  Therefore, Alderete-Lopez

must meet the heightened burden, including a "strong showing" of likelihood of success on the

merits.  See 389 F.3d at 975.  Alderete-Lopez has not made that showing.  But even if the Court

used the usual standard, Alderete-Lopez has not met that standard.

Alderete-Lopez argues that he is likely to succeed on the merits, because the Supreme

Court's decision in Pereira v. Sessions renders void his underlying removal order.  As discussed

above, the Court does not have jurisdiction to review this claim, and therefore the Petition cannot

succeed on this basis before a federal district court.  Moreover, the immigration court acquired

jurisdiction to order Alderete-Lopez' removal in the February 9, 2017, proceeding.

An immigration court is vested with jurisdiction over an immigration proceeding "when a

charging document is filed with the Immigration Court."  8 C.F.R. § 1003.14.  The term "charging

document" includes an NTA.  8. C.F.R. § 1003.13.  Under § 1003.15(b), a "notice to appear" must

contain:

> (1) The nature of the proceedings against the alien;
>
> (2) The legal authority under which the proceedings are conducted;
>
> (3) The acts or conduct alleged to be in violation of law;
>
> (4) The charges against the alien and the statutory provisions alleged to have been
> violated;
>
> (5) Notice that the alien may be represented, at no cost to the government, by
> counsel or other representative authorized to appear pursuant to 8 CFR 1292.1;
>
> (6) The address of the Immigration Court where the Service will file the Order to
> Show Cause and Notice to Appear; and
>
> (7) A statement that the alien must advise the Immigration Court having
> administrative control over the Record of Proceeding of his or her current address

and telephone number and a statement that failure to provide such information may result in an in absentia hearing in accordance with § 1003.26.

8 C.F.R. § 1003.15.  Further, § 1003.15 establishes that a "notice to appear" must provide the

following information to the immigration court:

> (1) the alien's names and any known aliases;

> (2) the alien's address;

> (3) the alien's registration number, with any lead alien registration number with which the alien is associated;

> (4) The alien's alleged nationality and citizenship; and

> (5) The language that the alien understands.

8 C.F.R. § 1003.15(c).  Section 1003.18, which discusses case scheduling, provides:

> In removal proceedings pursuant to section 240 of the Act, the Service shall provide in the Notice to Appear, the time, place and date of the initial removal hearing, where practicable. If that information is not contained in the Notice to Appear, the Immigration Court shall be responsible for scheduling the initial removal hearing and providing notice to the government and the alien of the time, place, and date of hearing.

8 C.F.R. § 1003.18(b) (emphasis added).  Although the regulations specify that an NTA shall

"where practicable" include "the time, place and date of the initial removal hearing," such

information is not listed as a requirement to vest the immigration court with jurisdiction.  Compare

8 C.F.R. § 1003.18, with 8 C.F.R. § 1003.14.  To the contrary, the regulations specifically provide

that, if the notice to appear does not contain the information regarding the time, place and date of

the removal hearing, the immigration court can provide the noncitizen with that information in a

subsequent notice.  See 8 C.F.R. § 1003.18(b).  This scenario is what occurred here.

Here, Alderete-Lopez does not contend that the June 8, 2011, NTA that initiated his

February 9, 2017, removal proceeding failed to comply with 8 C.F.R. §§ 1003.15 and 1003.18.

Indeed, the record confirms that the June 8, 2011, NTA complies fully with the regulations: (i)

DHS filed with the immigration court and served Alderete-Lopez with a NTA that included all the information that § 1003.15 requires; and (ii) the immigration court subsequently provided Alderete-Lopez with a hearing notice sufficient to enable his participation, as § 1003.18 prescribes. See Dec. 4 Tr at 11:1-4 (Juarez)( "He got a notice of a hearing. And then, based on the notice of a hearing, he appeared."); 8 C.F.R. § 1003.18. It follows that the immigration court was properly vested with jurisdiction.

Seeking to circumvent this conclusion, Alderete-Lopez argues that the Supreme Court's decision in Pereira v. Sessions, requires that an NTA must include the date and time of the removal hearing and, because Alderete-Lopez' June 2011, NTA failed to include this information, that the NTA could not vest jurisdiction in the immigration court. That argument fails; Pereira v. Sessions's narrow holding does not require a NTA to include the date and time of a noncitizen's pending removal proceeding to vest the immigration court with jurisdiction over the proceeding.

In Pereira v. Sessions, the Supreme Court addressed only the "narrow question" whether a NTA that does not specify a removal proceeding's time or place can trigger the stop time rule. Pereira v. Sessions, 138 S. Ct. at 2110. The stop-time rule provides that, for purposes of determining a noncitizen's eligibility for cancellation of removal under § 1229b(b)(1), the noncitizen's period of continuous physical presence in the United States ends "when the alien is served a notice to appear under section 1229(a)." Pereira v. Sessions, 138 S. Ct. at 2110 (quoting 8 U.S.C. § 1229b(d)(1)(A)). Section 1229(a), in turn, provides that "written notice (in this section referred to as a 'notice to appear') shall be given . . . to the alien . . . specifying," among other things, "[t]he time and place at which the [removal] proceedings will be held." Based on § 1229b(d)(1)(A)'s plain text, which expressly references § 1229(a), the Supreme Court concludes

that a notification that does not specify the date and time of the removal proceeding is not a "notice to appear" that triggers the stop-time rule.  Pereira v. Sessions, 138 S. Ct. at 2114.

Pereira v. Sessions's narrow holding is distinguishable from the question presented here, namely whether an NTA must contain the time, place and date of the removal hearing to vest the immigration court with jurisdiction.  First, the Court notes that the Supreme Court itself expressly defined its holding as "narrow."  138 S. Ct at 2110.  Indeed, Pereira v. Sessions specifically acknowledges that § 1003.18 states that a "notice to appear" "need only provide 'the time, place and date of the initial removal hearing, where practicable,'" but declined to remark on the regulation's effect beyond the stop-time-rule context.  138 S. Ct. at 2111-12 (quoting 62 Fed. Reg. 10332 (1997)(codified at 8 C.F.R. § 1003.18)).  Pereira v. Sessions's scope is thus, by its own terms, cabined within the stop time-rule's narrow confines.

Moreover, and more significantly, the Supreme Court's decision in Pereira v. Sessions turns on § 1229b(d)(1)(A)'s explicit reference to § 1229(a)'s definition of what constitutes a "notice to appear."  Unlike the stop-time rule, the regulations governing the vesting of jurisdiction in an immigration court do not reference § 1229(a)'s "notice to appear" definition.  Compare 8 C.F.R. §§ 1003.14-1003.15, with 8 U.S.C. § 1229b(d)(1).  To the contrary, the regulations themselves prescribe the information that a NTA must contain to vest the immigration court with jurisdiction, see 8 C.F.R. § 1003.15(b)-(c), i.e., in contrast with the stop-time rule construed in Pereira v. Sessions, the regulations governing the immigration court's jurisdiction provide no basis for incorporating § 1229(a)'s list of requisite "notice to appear" information.

Finally, § 1229(a)'s text confirms that the Court should not extend Pereira v. Sessions's holding that § 1229(a) provides the definition of "notice to appear" for stop-time-rule purposes to add to the regulations' list of information that a NTA must include for purposes of vesting the

immigration court with jurisdiction. Section 1229(a) provides, in relevant part, that "written notice (in this section referred to as a "notice to appear") shall be given . . . specifying," as is relevant here, "[t]he time and place at which the proceedings will be held." 8 U.S.C. § 1229(a) (emphasis added). Thus, § 1229(a) purports to define only "notice to appear" as the term is used in the statute, such as in the stop-time rule in 1229b(d)(1)(A). See Pereira v. Sessions, 138 S. Ct. at 2114 ("Section 1229(a), in turn, clarifies that the type of notice 'referred to as a 'notice to appear' throughout the statutory section . . . .'" (emphasis added)). Alderete-Lopez does not argue that § 1229(a), or the neighboring statutory framework, addresses the vesting of jurisdiction in the immigration court. Indeed, § 1229(a) describes the information of which a noncitizen subject to a removal proceeding must receive notice; the standard for determining how and when the immigration court's jurisdiction vests is found only in the regulations. See 8 U.S.C. § 1229(a); 8 C.F.R. § 1003.13-15. Hence, because § 1229(a)'s "notice to appear" definition is expressly limited to the statute's use of the term "notice to appear," the Court concludes that Alderete-Lopez cannot soundly extend Pereira v. Sessions's holding, which interprets and applies § 1229(a), to modify the regulatory framework governing the immigration court's jurisdiction.

**IT IS ORDERED** that: (i) the Respondents' Motion to Dismiss Petition for Writ of Habeas Corpus for Lack of Subject Matter Jurisdiction, filed December 3, 2016 (Doc. 6), is granted; and (ii) the Petition for Writ of Habeas Corpus and Release from Detention Pursuant to 28 U.S.C. § 2241, filed November 29, 2018 (Doc. 1), is dismissed without prejudice for lack of subject-matter jurisdiction.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Santiago E. Juarez
Santiago E. Juarez Attorney at Law
Albuquerque, New Mexico

      *Attorney for the Petitioner*

John C. Anderson
  United States Attorney
Tiffany L. Walters
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Respondents*